| | | |
|---|---|---|
| **Juan Delvila, Juan Soler, Tony Mason,** | **:** | **United States District Court** |
| **Christine Handy, Stephen Lewis,** | **:** | **Eastern District of Pennsylvania** |
| **Aurea Ocasio, Plaintiffs,** | **:** | |
| **vs.** | **:** | |
| **Thomas Liciardello, Brian Reynolds,** | **:** | **Civil Division – Civil Rights** |
| **Jeffrey Walker, Perry Betts, Michael Spicer,** | **:** | |
| **Jonathan Speiser, Linwood Norman, Roberito** | **:** | |
| **Fontan, Erik Pross, The Kintock Group, LLC,** | **:** | |
| **Supervisor Carmona, Scott Schweizer** | **:** | |
| **Defendants** | **:** | **Case No.: 15-cv-2521** |

# AMENDED COMPLAINT

1. Plaintiff Juan Delvila ("Delvila") via counsel, David Wesley Cornish, Esquire, Complains and states he was injured as follows, and via 42 U.S.C. §§1983, 1985, and 1988, of the civil rights laws passed by Congress, provides the appropriate remedy to persons who have been deprived of their federal constitutional statutory rights under the color of state law.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and the Civil Rights Act of 1871, 42 U.S.C. §§1983, 1985, and 1988.
3. This Court has supplemental jurisdiction for the state law claims, pursuant to 28 U.S.C. §1367.
4. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) in that Defendants work and reside in this district and virtually all the acts described in this Complaint occurred in this district.

## PLAINITFF

5. Plaintiff is **Juan Delvila**, an individual and resident of the United States of America, and the Commonwealth of Pennsylvania and the City of Philadelphia.
6. Plaintiff is **Juan Soler**, an individual and resident of the United States of America, and the Commonwealth of Pennsylvania and the City of Philadelphia.

7. Plaintiff is **Tony Mason**, an individual and resident of the United States of America, and the Commonwealth of Pennsylvania and the City of Philadelphia.
8. Plaintiff is **Christine Handy**, an individual and resident of the United States of America, and the Commonwealth of Pennsylvania and the City of Philadelphia.
9. Plaintiff is **Stephen Lewis**, an individual and resident of the United States of America, and the Commonwealth of Pennsylvania and the City of Philadelphia.
10. Plaintiff is **Aurea Ocasio**, an individual and resident of the United States of America, and the Commonwealth of Pennsylvania and the City of Philadelphia.

## DEFENDANTS

11. Defendant is **Police Officer Brian Reynolds**, a police officer for the Philadelphia Police Department, who lives and resides in the Commonwealth of Pennsylvania.
12. Defendant is **Police Officer Thomas Liciardello**, a police officer for the Philadelphia Police Department, who lives and resides in the Commonwealth of Pennsylvania.
13. Defendant is **Police Officer Perry Betts**, a police officer for the Philadelphia Police Department, who lives and resides in the Commonwealth of Pennsylvania.
14. Defendant is **Police Officer Jeffrey Walker**, a police officer for the Philadelphia Police Department, who lives and resides in the Commonwealth of Pennsylvania.
15. Defendant is **Police Officer Michael Spicer**, a police officer for the Philadelphia Police Department, who lives and resides in the Commonwealth of Pennsylvania.
16. Defendant is **Police Officer Jonathan Speiser**, a police officer for the Philadelphia Police Department, who lives and resides in the Commonwealth of Pennsylvania.
17. Defendant is **Police Officer Linwood Norman**, a police officer for the Philadelphia Police Department, who lives and resides in the Commonwealth of Pennsylvania.

18. Defendant is **Police Officer Roberito Fontain**, a police officer for the Philadelphia Police Department, who lives and resides in the Commonwealth of Pennsylvania.

19. Defendant is **Police Officer Scott Schweizer**, a police officer for the Philadelphia Police Department, who lives and resides in the Commonwealth of Pennsylvania.

20. Defendant is **Police Officer Erik Pross**, a police officer for the Philadelphia Police Department, who lives and resides in the Commonwealth of Pennsylvania.

21. Defendant is **City of Philadelphia**, a first-class city and municipality in the Commonwealth of Pennsylvania, represented via the Philadelphia City Law Department, and who owns and operates its instrumentality the Philadelphia Police Department.

22. Defendant, **The Kintock Group, LLC**, a multistate business enterprise with offices at 580 Virginia Drive, Suite 250 Fort Washington, PA 19034.

23. Defendant, **Supervisor Carmona**, is employed by the Kintock Group with a business address of 580 Virginia Drive, Suite 250 Fort Washington, PA 19034.

## FACTUAL BACKGROUND

24. At all relevant times, the Defendants acted under the color of law as municipally employed law enforcement officers and are averred to have while on active duty and as a first-class municipality for the Commonwealth of Pennsylvania committed the below-listed counts and offenses.

25. At all times The Kintock Group, LLC was a residential provider for formerly incarcerated individuals transitioning into free society, via a halfway house.

26. The Kintock Group, LLC was acting as a state certified and contracted agent acting under and pursuant to the color of law.

27. The halfway house operated by The Kintock Group, LLC, was subject to the same rules and regulations regarding the standards of care including for safety as any other prison facility and/or law enforcement agency.

**I. Juan Delvila**

28. On or about July 16, 2008, Defendants and their agents, employees, and subordinate officers arrested and charged[1] Plaintiff Juan Delvila for possession of a controlled substance with intent to distribute and related offenses.

29. At Plaintiffs had preliminary hearings within the Commonwealth of Pennsylvania via the Philadelphia District Attorney's Office, presented testimony from Police Officer Thomas Liciardello and other Defendant Officers to establish probable cause to hold the case for court[2].

30. Based upon Officer Thomas Liciardello's and these other Defendant Officers' testimony the District Attorney presented and the Honorable Nazario Jiminez accepted into evidence all the relevant police paperwork[3].

31. Officer Liciardello's testimony and paperwork implicated all Plaintiff in criminal conduct.

32. Officer Liciardello testified on or about May 19, 2008, working as a Philadelphia Police Officer in the area of the 2900 Block of Ruth Street in the City and County of Philadelphia[4].

33. Officer Liciardello claims he received information from a confidential source/informant and observed a Ford Mustang with a Georgia tag arrive and park in front of 2942 Ruth Street.

34. Officer Liciardello stated Pierre Nicholson ("Nicholson") exited the vehicle holding a white plastic bag and handed it to Delvila at which point he took the bag and placed it behind the rear driver's seat of a silver Oldsmobile Aurora.

35. Defendant Liciardello claims Plaintiff Delvila entered the Aurora, at which time Defendant Liciardello followed him onto the 400 Block of Auburn Street where he parked the vehicle and walked toward the area of Kensington and Cambria Streets where police lost him within the area.

---

[1] **CP-51-CR-25771-2008**
[2] N.T. 7/16/2008 2:4-5
[3] N.T. 7/16/2008
[4] N.T. 6/21/2013 5:15-24

36. Defendant Liciardello stated he walked over to the Oldsmobile Aurora at which point he observed on the floor of the back seat of the vehicle behind the driver's side numerous bundles of heroin inside the white plastic bag.

37. At this time, Defendant Liciardello claims Nicholson left the area on Ruth Street and was stopped and secured by Highway Patrol Officers.

38. Plaintiff Delvila, Defendant Liciardello claims was found walking along Cambria Street from Kensington Avenue at which point Philadelphia Police Officers stopped and secured him and walked him over to the Oldsmobile.

39. Keys recovered by Officer Liciardello were utilized to open the Oldsmobile and within the plastic bag found twenty (20) bundles, each containing fourteen (14) packets for a total of two hundred and eighty (280) of alleged heroin, each stamped King Kong with a black gorilla.

40. Defendant Liciardello also claims to have recovered was one bundle containing fourteen (14) alleged heroin packets each stamped with Coca-Cola.

41. Defendant Liciardello stated he conducted a NIK Test A&L on the heroin recovered which came back positive.

42. Shortly after Plaintiff Delvila walks away from the parked car, Defendant Liciardello who claims he was in constant radio and/or phone contact with other officers, was able to view the heroin within the white bag behind the driver's seat.

43. Defendants Brian Reynolds and Jeffrey Walker assisted Defendant Liciardello with conducting this investigation of Plaintiff Delvila and Nicholson.

44. During his and after his arrest, investigation, and interrogation Delvila was punched, spat on, kicked, had his shoulder twisted in the opposite direction, hit with a police issued baton/nightstick multiple times, was cursed at, and threatened with further harm should he reveal to other authorities what Officers Liciardello, Walker, and Reynolds did.

45. Officers Liciardello, Walker, and Reynolds incident to Plaintiff Delvila's arrest removed money on his person, approximately, six hundred and twenty-six dollars ($626) and did not place this currency onto a property receipt or otherwise voucher/enter it as evidence.

46. Defendants Liciardello, Walker, and Reynolds incident to Plaintiff Delvila's arrest removed a cellular phone on his person, and did not place this item onto a property receipt or otherwise voucher/enter it as evidence.

47. Defendants Liciardello, Walker, Reynolds, and others believed to be Defendant Betts, Norman, Spicer, and/or Speiser, incident to Plaintiff Delvila's arrest threatened to tell other alleged and known narcotics dealers in Philadelphia that Delvila was a cooperating Governmental witness, who was informing about their alleged criminal activity.

48. Defendants Liciardello, Walker, Reynolds, and others believed to be Defendant Betts, Norman, Spicer, and/or Speiser, incident to Plaintiff Delvila's arrest placed him into the back of the police vehicle and drove him around to known high trafficking drug corners in the immediate Kensington vicinity and stopped at a few corners and started pointing to persons standing on the street, attempting to imply Delvila was working as a government witness attempting to identify persons committing crimes.

49. Almost immediately after his incarceration for this case pending trial, due to the Defendants actions, Plaintiff Delvila was attacked on at least seven (7) different occasions by other inmates because he was believed to be a cooperating witness and was seen identifying their friends and relatives while in the back of a police car in Kensington.

50. Plaintiff Delvila suffered serious physical, mental, and emotional injuries due to these repeated assaults before his trial.

51. After serving time in jail and state correctional institutions, Plaintiff Delvila was released to the halfway house The Kintock Group at 301 East Erie Avenue Philadelphia, PA 19134.

52. During his incarceration at Kintock, Plaintiff Delvila directly observed multiple supervisors and Kintock staff smuggling, distributing, and otherwise trafficking narcotics, in particular Supervisor Carmona.

53. Plaintiff Delvila directly overheard conversations between Supervisor Carmona and other Kintock Group staff involved in narcotics distribution, discuss that they received narcotics shipments from a drug crew operating in the Waterloo, Cumberland, Hope, and Huntingdon Streets area.

54. Supervisor Carmona stated his cousin was a mid-level manager within this drug enterprise and he was able to get a great price and that if any drugs are found inside the institution they can be planted on prisoners they labeled “problematic”.

55. Supervisor Carmona also stated Defendant Walker, later identified as Jeffrey Walker, was getting paid off the tips he received on their rival’s location by getting a cut of the drugs sold and additionally, Defendant Walker provided confidential police information to Supervisor Carmona and members of this “Waterloo Street Drug Crew” about pending investigations, surveillances, and other police operations in receipt for a percentage of revenue generated from the Waterloo Street Drug Crew’s trafficking activities.

56. Shortly after Plaintiff Delvila’s arrival, numerous staff members approached him about trafficking narcotics within the institution to which Plaintiff Delvila repeatedly declined.

57. After repeated denials, Supervisor Carmona approached Plaintiff Delvila and told him if “he did not play ball, it would be very easy for drugs to turn up in his room”.

58. Supervisor Carmona and other staff involved in the narcotics activity ordered other prisoners involved in the scheme to assault Plaintiff Delvila. These prisoners attempted to harm Plaintiff Delvila on at least four (4) different occasions. After the fourth attempted assault, Plaintiff Delvila suffered significant injuries, and was denied access to any medical care or treatment for which he suffered significant mental, physical, and emotional injuries.

59. After this fourth assault, Supervisor Carmona told Plaintiff Delvila next time he was not going to escape so easily, and told him he would be placed into a combat match.

60. This "combat match" was a frequent occurrence at the Kintock Group facility, whereby guards would lock 3-4 inmates into a small cell, and bet amongst themselves and with the inmates about who would emerge as the winner.

61. At this point, Plaintiff Delvila, left Kintock Group facility without permission to avoid being murdered by Supervisor Carmona and other staff.

62. Plaintiffs were charged with possession with intent to deliver and conspiracy.

63. The charges against Plaintiffs were ultimately terminated in Plaintiff's favor.

**II. Juan Soler**

64. Petitioner Juan Soler was arrested on or about November 24, 2003, by Defendant Roberito Fontan, and charged[5] with Manufacture, Delivery, or Possession With Intent to Manufacture or Deliver, Possession of a Firearm, Possession of an Instrument of Crime, Intentional Narcotics Possession, Possession of Drug Paraphernalia, Resisting Arrest, and Criminal Conspiracy Engaging in Possession with Intent to Manufacture or Deliver.

65. Plaintiff had a jury trial before the Honorable Glenn Brunson whereby he was found guilty.

66. Plaintiff was sentenced on 6/5/2007 to 5 to 10 years confinement and to pay fines, costs, and restitution.

67. On or about August 23, 2016, Judge Woods-Skipper, nolle prosequi all charges against the Plaintiff.

68. The critical police officer in the instant case was Roberito Fontan.

69. Roberito Fontan claims to have utilized a Confidential Informant (Person #1) to purchase narcotics from the Plaintiff.

[5] CP-51-CR-809402-2004

70. Plaintiff claims the Confidential Informant was directed to purchase drugs by Roberito Fontan due to his jealousy regarding a friendship between the Confidential Informant and the Plaintiff.

71. The only persons who witnessed these alleged transactions and the Plaintiff engaging in any other illegal activity was the Confidential Informant and Defendant Fontan.

72. Plaintiff denies selling and/or possessing narcotics and/or a firearm at any time claimed by Defendant Fontan.

73. Plaintiff Soler served time in jail, state correctional institutions, until he was released to the Kintock halfway house.

74. While at Kintock, Plaintiff Soler was approached by Supervisor Carmona and numerous other staff, about trafficking narcotics, a request he repeatedly refused.

75. Supervisor Carmona persisted in trying to recruit Plaintiff Soler to traffic narcotics because he believed Soler and him had a common connection who was friends with multiple members of the Waterloo Street Drug Crew and that via this connection Supervisor Carmona would be able to increase his illicit income and standing within the group.

76. Supervisor Carmona and other Kintock staff told other inmates to repeatedly attack Plaintiff Soler, and spread rumors that he was a cooperating government witness and was going to testify against numerous other inmates.

77. Supervisor Carmona placed Soler in a combat match whereby Soler received significant injuries including bruises, bleeding, lost teeth, muscle spasms, scrapes, blurred vision, and numerous other abrasions.

78. Supervisor Carmona and other Kintock staff withheld medical care and treatment for Plaintiff Soler thereby inflaming his injuries.

79. A week or so later Supervisor Carmona approached Plaintiff Soler and informed him he would no longer be receiving any of his prescribed medication from the medical area then handed a bed sheet to Soler and told him he “could always take the easy way out”.

80. Until Soler left the facility he was continually assaulted and threatened by staff, including Defendant Supervisor Carmona, and other inmates in addition to having all prescribed medication withheld.

81. After Plaintiff Soler left Kintock, Supervisor Carmona and his cousin in the Waterloo Street Drug Crew where riding in a sports utility vehicle, in the area of 2nd Street and West Allegheny Avenue, as Soler was leaving the restaurant Freddy and Tony's.

82. As Soler was crossing the street, the SUV came to a sudden stop behind him and three people exited the vehicle and started yelling in his direction and discharged their firearms at him.

83. Before the shooting began, Plaintiff Soler recognized one of the shooters as Supervisor Carmona, who also appeared to exit from the driver's seat. Approximately six shots were fired at Plaintiff Soler as he ran down North 2nd Street towards West Westmoreland Street where he escaped danger.

84. Approximately a week after the first shooting, Plaintiff Soler was walking along Cambria Street towards North Water Street when a car suddenly pulled up next to him and two people quickly exited, drawing firearms, and began shooting at Plaintiff Soler. Plaintiff Soler recognized the passenger as one of the persons who had shot at him the week before adjacent to Freddy and Tony's.

85. Plaintiffs were charged with possession with intent to deliver and conspiracy.

86. The charges against Plaintiffs were ultimately terminated in Plaintiff's favor.

**III. Tony Mason**

87. On April 6, 2005, Tony Mason was arrested by Defendant Walker and other members of the Narcotics Strike Force, believed to be Defendant Betts, Reynolds, Liciardello, Norman, Spicer, and Speiser for narcotics sales related offenses.

88. During and after his arrest, Defendant Mason was struck, beaten, and otherwise assaulted causing head, neck, and lower body injuries, by Defendants after he was already handcuffed.

89. Defendant Walker purposefully adjusted the handcuffs locking mechanism so it was so tight as to cause Plaintiff Mason to lose feeling in his hands and fingers, a condition he still is currently suffering from.

90. Defendant Walker and other law enforcement agents believed to be Defendant Betts, Reynolds, Liciardello, Norman, Spicer, and Speiser, threatened to continue physically assaulting Plaintiff Mason if he did not provide information about other narcotics dealers and the location of a stash of money.

91. Defendants removed approximately $730 from Plaintiff Mason's person, which was never placed on a property receipt nor was otherwise vouchered or placed into evidence for further processing.

92. Defendants falsely planted a weapon, attributing its possession, ownership, dominion, and control to Plaintiff Mason.

93. Plaintiff Mason at no time during his interaction with the Defendants possessed narcotics and/or any weapons.

94. Plaintiff Mason at no time tried to resist the Defendants' orders and commands.

95. Plaintiff was charged with possession with intent to deliver and conspiracy.

96. The charges against Plaintiffs were ultimately terminated in Plaintiff's favor.

**IV. Stephen Lewis and Christine Handy**

97. On December 12, 2012 Stephen Lewis, Christine Handy, Zakiyyah Lewis, Kharon Fortune Lewis, Adejah Lewis were at 1116 North Sloan Street Philadelphia, PA 19104 where all resided.

98. Defendants Betts, Norman, and Walker all dressed in plainclothes started banging on the front door and when Adejah Lewis, a child at the time, answered the door.

99. Defendant Betts immediately grabbed Adejah Lewis by the back area while simultaneously pointing his firearm within inches of her forehead.

100. Defendant Betts told her to be quiet as he entered the premises while still grasping her, and told Kharon Fortune Lewis who was sitting on a couch nearby to be quiet as Defendants Walker and Norman pointed their firearms at him and his friend identified only as Michael.

101. At this time, Kharon Lewis was also a minor.

102. Defendant Betts continued walking through the house with Adejah Lewis leading the way and with his firearm pointed to the back of her head.

103. As Defendant Betts lead Adejah Lewis up the stairs, he encountered a naked Plaintiff Christine Handy who was getting changed after showering and started yelling at Plaintiff Handy to get down and where was the Percocet.

104. At this time, Defendant Betts handcuffed Plaintiff Handy and took her downstairs along with Adejah Lewis, while Officer Norman searched the house and encountered Stephen Lewis who was handcuffed and taken downstairs also.

105. Shortly thereafter, Zakiyyah Lewis, also a minor walked downstairs after hearing loud noises.

106. While all Plaintiffs were restrained Defendant Walker began questioning them, while Defendant Betts and Norman ransacked the house, and Defendant Liciardello, along with other officers believed to be Reynolds, Speiser, and Spicer controlled the exterior perimeter.

107. Defendants Betts and Norman unnecessarily destroyed Plaintiffs' property by smashing holes in walls, breaking furniture, and purposefully ruptured a pipe causing interior flooding.

108. While Defendants were searching and securing the home, Defendant Walker left the premises and came back approximately two hours later with an unsigned search warrant which he proceeded to sign in the living room of the Sloan Street premises.

109. Before removing Plaintiffs Handy and Lewis for transportation, Defendants Betts, Liciardello, Walker, and Norman stole approximately $21,000.

110. Plaintiffs had $17,000 on hand because they were going to pay attorney Burt Rose's fee to represent Braheem Lewis and Hakeem Lewis in an unrelated case.

111. Plaintiffs had approximately an additional $4,000 on hand as a Christmas savings fund as the holiday was only two weeks away at the time.

112. These same Defendants also searched Plaintiff Lewis and seized from him $150, a cellular phone, and his transit pass.

113. Defendants seized from the friend Mike, who was also a minor, his cell phone and approximately $55.

114. None of the arresting or investigating Defendants placed the full amount of money and property seized from the persons inside the premises and the building on any property receipt or evidence voucher.

115. While Plaintiffs were being questioned at the police station and awaiting their respective bail hearings, Defendants Liciardello, Betts, Walker, Norman, Spicer, Speiser, and/or their accomplices broke into the Sloan Street premises by kicking the front door down and left it unsecured causing numerous electronics, including televisions and video game consoles, were removed from the premises.

116. Plaintiffs were charged with possession with intent to deliver and conspiracy.

117. The charges against Plaintiffs were ultimately terminated in Plaintiff's favor.

**V. Aurea Ocasio**

118. On October 16, 2011, at approximately 11:45pm, Aurea Ocasio, was assaulted by Defendants Schweizer and Pross while those Officers were allegedly conducting a drug investigation in the 500 Block of Indiana Avenue, involving Kevin Jones, Jasmine Johnson, and Hector Alicea.

119. Defendant Schweizer pushed Ocasio, forcibly took her van keys, and without a warrant, permission, or an exigency searched her vehicle causing and in the process causing property damage.

120. After searching Plaintiff's vehicle, Plaintiff Ocasio, and witnesses Ruth Martinez and Elisa Velazquez witnessed, Defendants Schweizer and Pross physically strike, assault, curse at, and harm Hector Alicea while he was handcuffed and prior to transporting him to the police department for further processing.

121. The Defendants suspected Mr. Alicea of having sold narcotics to

122. Plaintiffs' counsel represents, Kevin Jones and Hector Alicea, and during criminal pre-trial preparations listed on numerous documents and filings Ocasio's name, address, birth date, and attested to statements regarding Alicea and Jones' arrests.

123. On approximately October 12, 2013, Ocasio, listed via her married name as Aurea Martinez, filed along with Eliza Velazquez, Ruth Martinez, Kevin Jones, and Hector Alicea a civil rights complaint naming Officers Schweizer and Pross among others as Defendants.

124. On approximately May 7, 2014, while Ocasio was in Florida, Alicea had a suppression hearing, and the Commonwealth presented testimony by Officer Schweizer. During the testimony, Officer Schweizer stated while looking at Defense Counsel and the Defendant that he did not like him and that it was personal, to which the Court admonished him to put his personal feelings aside. This suppression hearing was bifurcated, and arguments were reserved until May 12, 2014.

125. While on the record, Officer Schweizer was sitting inside the courtroom, near Ruth Martinez, and Alicea's counsel asked for a continuance for trial, which was granted, to immediately start after the suppression hearing on May 12, 2014, because Ocasio would still be in Florida at that time.

126. On approximately May 7, 2014, an alleged homicide occurred at the intersection of Indiana and Hartville Streets.

127. On approximately May 14, 2014, Defendants Schweizer and Pross while on duty and in plain clothes, drove around Plaintiff Ocasio's church while she was sitting outside pointing at her and yelling offensive comments.

128. Around 3:30pm, Defendants Schweizer and Pross were recorded by Plaintiff Ocasio stopping and questioning her in relation to the homicide that occurred on May 7, 2014.

129. When Defendants encountered her outside her church, the Defendants ordered her to go into the premises and retrieve her identification, at which point as she entered her home (adjacent to the church).

130. Defendant Pross followed her inside her home and slammed the door shut behind her.

131. Defendant Pross then told her she knew what "this was about" and that she had "better do the right thing" and he cursorily searched her adjacent personal property.

132. After threatening her, Defendant Pross took her identification and handed it to Defendant Schweizer who was standing directly against the front door and then returned to the unmarked police vehicle and allegedly ran her information.

133. During this time, Defendant Pross was talking to Ocasio and when Defendant Schweizer returned both explained on video, the only reason they were there is because allegedly homicide detectives told them she needed to be interviewed.

134. Defendants knew Plaintiff was not in Pennsylvania at the time of the alleged murder and used that crime as a ruse to be able to harass and intimidate Plaintiff from testifying in legal matters.

**PLAINTIFF'S INJURIES**

135. Plaintiff alleges and incorporates via reference the allegations contained in all the above paragraphs, as fully as though the same were set forth herein at length.

136. Due to the Defendants actions Plaintiff suffered the following injuries:

a. Physical discomfort from being arrested;

b. A loss of enjoyment and quality of life due to the Defendants actions in injuring him which caused physical and psychological injuries;

c. A loss of employment/business opportunities, in particular his job with FedEx due to the Defendants actions injuring him;

d. Loss of opportunities to continue his education and training:

e. Inconvenience, embarrassment, shame, and anxiety from Plaintiff's arrest and prosecution;

f. Litigation expenses for this civil matter including but not limited to filing fees, administrative fees, expert fees, court costs, civil counsel fees, and the like.

**COUNT 1 – MALICIOUS PROSECUTION (Juan Delvila v. Thomas Liciardello, Michael Spicer, Jonathan Speiser, Linwood Norman, Perry Betts, Jeffrey Walker, and Brian Reynolds)**

137. Plaintiff alleges and incorporates via reference the allegations contained in all the above paragraphs, as fully as though the same were set forth herein at length.

138. Plaintiff avers the Defendant initiated criminal proceedings in the underlying criminal case, against him via arrest, filing a criminal complaint, processing him, and consulting the District Attorney's Office about further charging him.

139. Plaintiff avers the Defendant lacked probable cause, as articulated in the United States Constitution's 4th Amendment and applied to the states via the 14th Amendment, to stop, search, and detain Plaintiffs when they first encountered him, and lacked probable cause to arrest and because the Defendants arrested him, his resulting imprisonment was unjust, illegal, and was the direct and causal reason he was incarcerated.

140. Plaintiff's criminal charges terminated in his favor when all charges were dismissed.

141. Plaintiff avers the Defendants acted maliciously or for a purpose other than bringing him to justice, as Plaintiff was not committing a crime when he first encountered the Defendant.

142. Plaintiff avers because of this criminal proceeding; he suffered a significant deprivation of liberty and freedom spending time in pre-trial incarceration.

143. Further, Plaintiff avers Defendants obscured the District Attorney's Office from making an independent judgment about the merits of prosecution as these Defendants failed to provide materially honest evidence and statements regarding Plaintiffs, the evidence observed, and recovered.

144. Plaintiff avers but for the Defendants filing a criminal complaint based on a gross misapplication of clearly stated law, and/or fabricated/non-existent evidence, he would never have had a criminal case initiated against him.

145. The Defendants directly, foreseeably, legally, and proximately caused Plaintiffs to have suffered unjust, unwarranted, and unlawful incarceration, prosecution, and/or will continue to suffer the following damages: Physical injuries including pain and suffering, Public shame and embarrassment, Loss of enjoyment of life, Loss of enjoyment of freedom, Loss of employment/educational opportunities and wages, and Past and future pain and suffering, extreme inconvenience, and emotional distress.

**WHEREFORE**, Plaintiff demands judgment against Defendants, in an official, professional, individual, and personal capacity, individually, jointly, and severally for compensatory, punitive, and exemplary damages in addition to attorneys' fees, costs, interest, and the like in excess of one hundred and fifty-thousand dollars ($150,000).

**COUNT 2 – MALICIOUS PROSECUTION (Juan Soler v Roberito Fontan)**

146. Plaintiff alleges and incorporates via reference the allegations contained in all the above paragraphs, as fully as though the same were set forth herein at length.

147. Plaintiff avers the Defendant initiated criminal proceedings in the underlying criminal case, against him via arrest, filing a criminal complaint, processing him, and consulting the District Attorney's Office about further charging him.

148. Plaintiff avers the Defendant lacked probable cause, as articulated in the United States Constitution's 4th Amendment and applied to the states via the 14th Amendment, to stop, search, and detain Plaintiffs when they first encountered him, and lacked probable cause to arrest and because the Defendants arrested him, his resulting imprisonment was unjust, illegal, and was the direct and causal reason he was incarcerated.

149. Plaintiff's criminal charges terminated in his favor when all charges were dismissed.

150. Plaintiff avers the Defendants acted maliciously or for a purpose other than bringing him to justice, as Plaintiff was not committing a crime when he first encountered the Defendant.

151. Plaintiff avers because of this criminal proceeding; he suffered a significant deprivation of liberty and freedom spending time in pre-trial incarceration.

152. Further, Plaintiff avers Defendants obscured the District Attorney's Office from making an independent judgment about the merits of prosecution as these Defendants failed to provide materially honest evidence and statements regarding Plaintiffs, the evidence observed, and recovered.

153. Plaintiff avers but for the Defendants filing a criminal complaint based on a gross misapplication of clearly stated law, and/or fabricated/non-existent evidence, he would never have had a criminal case initiated against him.

154. The Defendants directly, foreseeably, legally, and proximately caused Plaintiffs to have suffered unjust, unwarranted, and unlawful incarceration, prosecution, and/or will continue to suffer the following damages: Physical injuries including pain and suffering, Public shame and embarrassment, Loss of enjoyment of life, Loss of enjoyment of freedom, Loss of employment/educational opportunities and wages, and Past and future pain and suffering, extreme inconvenience, and emotional distress.

**WHEREFORE**, Plaintiff demands judgment against Defendants, in an official, professional, individual, and personal capacity, individually, jointly, and severally for compensatory, punitive, and exemplary damages in addition to attorneys' fees, costs, interest, and the like in excess of one hundred and fifty-thousand dollars ($150,000).

**COUNT 3 – MALICIOUS PROSECUTION (Christine Handy and Stephen Lewis v. Thomas Liciardello, Michael Spicer, Jonathan Speiser, Linwood Norman, Perry Betts, Jeffrey Walker, and Brian Reynolds)**

155. Plaintiff alleges and incorporates via reference the allegations contained in all the above paragraphs, as fully as though the same were set forth herein at length.

156. Plaintiff avers the Defendant initiated criminal proceedings in the underlying criminal case, against him via arrest, filing a criminal complaint, processing him, and consulting the District Attorney’s Office about further charging him.

157. Plaintiff avers the Defendant lacked probable cause, as articulated in the United States Constitution’s 4th Amendment and applied to the states via the 14th Amendment, to stop, search, and detain Plaintiffs when they first encountered him, and lacked probable cause to arrest and because the Defendants arrested him, his resulting imprisonment was unjust, illegal, and was the direct and causal reason he was incarcerated.

158. Plaintiff's criminal charges terminated in his favor when all charges were dismissed.

159. Plaintiff avers the Defendants acted maliciously or for a purpose other than bringing him to justice, as Plaintiff was not committing a crime when he first encountered the Defendant.

160. Plaintiff avers because of this criminal proceeding; he suffered a significant deprivation of liberty and freedom spending time in pre-trial incarceration.

161. Further, Plaintiff avers Defendants obscured the District Attorney's Office from making an independent judgment about the merits of prosecution as these Defendants failed to provide materially honest evidence and statements regarding Plaintiffs, the evidence observed, and recovered.

162. Plaintiff avers but for the Defendants filing a criminal complaint based on a gross misapplication of clearly stated law, and/or fabricated/non-existent evidence, he would never have had a criminal case initiated against him.

163. The Defendants directly, foreseeably, legally, and proximately caused Plaintiffs to have suffered unjust, unwarranted, and unlawful incarceration, prosecution, and/or will continue to suffer the following damages: Physical injuries including pain and suffering, Public shame and embarrassment, Loss of enjoyment of life, Loss of enjoyment of freedom, Loss of employment/educational opportunities and wages, and Past and future pain and suffering, extreme inconvenience, and emotional distress.

**WHEREFORE**, Plaintiff demands judgment against Defendants, in an official, professional, individual, and personal capacity, individually, jointly, and severally for compensatory, punitive, and exemplary damages in addition to attorneys' fees, costs, interest, and the like in excess of one hundred and fifty-thousand dollars ($150,000).

**COUNT 4 – MALICIOUS PROSECUTION (Tony Mason v. Thomas Liciardello, Michael Spicer, Jonathan Speiser, Linwood Norman, Perry Betts, Jeffrey Walker, and Brian Reynolds)**

164. Plaintiff alleges and incorporates via reference the allegations contained in all the above paragraphs, as fully as though the same were set forth herein at length.

165. Plaintiff avers the Defendant initiated criminal proceedings in the underlying criminal case, against him via arrest, filing a criminal complaint, processing him, and consulting the District Attorney's Office about further charging him.

166. Plaintiff avers the Defendant lacked probable cause, as articulated in the United States Constitution's 4th Amendment and applied to the states via the 14th Amendment, to stop, search, and detain Plaintiffs when they first encountered him, and lacked probable cause to arrest and because the Defendants arrested him, his resulting imprisonment was unjust, illegal, and was the direct and causal reason he was incarcerated.

167. Plaintiff's criminal charges terminated in his favor when all charges were dismissed.

168. Plaintiff avers the Defendants acted maliciously or for a purpose other than bringing him to justice, as Plaintiff was not committing a crime when he first encountered the Defendant.

169. Plaintiff avers because of this criminal proceeding; he suffered a significant deprivation of liberty and freedom spending time in pre-trial incarceration.

170. Further, Plaintiff avers Defendants obscured the District Attorney's Office from making an independent judgment about the merits of prosecution as these Defendants failed to provide materially honest evidence and statements regarding Plaintiffs, the evidence observed, and recovered.

171. Plaintiff avers but for the Defendants filing a criminal complaint based on a gross misapplication of clearly stated law, and/or fabricated/non-existent evidence, he would never have had a criminal case initiated against him.

172. The Defendants directly, foreseeably, legally, and proximately caused Plaintiffs to have suffered unjust, unwarranted, and unlawful incarceration, prosecution, and/or will continue to suffer the following damages: Physical injuries including pain and suffering, Public shame and embarrassment, Loss of enjoyment of life, Loss of enjoyment of freedom, Loss of employment/educational opportunities and wages, and Past and future pain and suffering, extreme inconvenience, and emotional distress.

**WHEREFORE**, Plaintiff demands judgment against Defendants, in an official, professional, individual, and personal capacity, individually, jointly, and severally for compensatory, punitive, and exemplary damages in addition to attorneys' fees, costs, interest, and the like in excess of one hundred and fifty-thousand dollars ($150,000).

**COUNT 5 – Monell Liability Claim (Juan Delvila v. City of Philadelphia)**

173. Plaintiff hereby incorporate all preceding paragraphs by reference as if set forth fully herein

174. In *Monell v. NY Dept. Social Services*, 436 U.S. 658 (1978), the Court held that municipal bodies sued under 1983 cannot be entitled to an absolute immunity.

175. The City of Philadelphia, Philadelphia Police Department via its agents, employees, servants, and others employed by the municipality and in particular Charles Ramsey, Richard Ross, Jr., Kevin Bethel, Thomas Wright, William Blackburn, and Denise Turpin, were put on notice as early as 1999, about the named Defendants and the rampant violations of citizens federal and Commonwealth constitutional rights, obstructions or justice, evidence tampering, perjury, mishandling of confidential sources/informants, hindering police investigations, and other similar acts on the part of those they were responsible for supervising years before and after the Plaintiff was arrested and prosecuted.

176. Numerous governmental commissioned reports and consent decrees regarding the Philadelphia Police Department were known to Defendant City of Philadelphia for many years prior to Plaintiff's arrest.

177. These Defendants refused to update, change, modify, or enact safer and more law-abiding Departmental policy, procedures, and/or customs, for ensuring compliance with the law. This ignorance of the plight of thousands of citizens, including the above-named Plaintiffs, were subjected to, amounts to deliberate indifference, by continuing to allow and promulgate Departmental policies, procedures, and customs to exist when these are improper and often illegal pursuant to *Monell v. NY Dept. Social Services*, 436 U.S. 658 (1978).

**WHEREFORE**, Plaintiff demands judgment against Defendants, in an official, professional, individual, and personal capacity, individually, jointly, and severally for all damages legally recoverable in addition to attorneys' fees, costs, interest, and all other relief the Court deems appropriate, and the like in excess of one hundred and fifty-thousand dollars ($150,000).

**COUNT 6 – Monell Liability Claim (Juan Soler v. City of Philadelphia)**

178. Plaintiff hereby incorporate all preceding paragraphs by reference as if set forth fully herein

179. In *Monell v. NY Dept. Social Services*, 436 U.S. 658 (1978), the Court held that municipal bodies sued under 1983 cannot be entitled to an absolute immunity.

180. The City of Philadelphia, Philadelphia Police Department via its agents, employees, servants, and others employed by the municipality and in particular Charles Ramsey, Richard Ross, Jr., Kevin Bethel, Thomas Wright, William Blackburn, and Denise Turpin, were put on notice as early as 1999, about the named Defendants and the rampant violations of citizens federal and Commonwealth constitutional rights, obstructions or justice, evidence tampering, perjury, mishandling of confidential sources/informants, hindering police investigations, and other similar acts on the part of those they were responsible for supervising years before and after the Plaintiff was arrested and prosecuted.

181. Numerous governmental commissioned reports and consent decrees regarding the Philadelphia Police Department were known to Defendant City of Philadelphia for many years prior to Plaintiff's arrest.

182. These Defendants refused to update, change, modify, or enact safer and more law-abiding Departmental policy, procedures, and/or customs, for ensuring compliance with the law. This ignorance of the plight of thousands of citizens, including the above-named Plaintiffs, were subjected to, amounts to deliberate indifference, by continuing to allow and promulgate Departmental policies, procedures, and customs to exist when these are improper and often illegal pursuant to *Monell v. NY Dept. Social Services*, 436 U.S. 658 (1978).

**WHEREFORE**, Plaintiff demands judgment against Defendants, in an official, professional, individual, and personal capacity, individually, jointly, and severally for all damages legally recoverable in addition to attorneys' fees, costs, interest, and all other relief the Court deems appropriate, and the like in excess of one hundred and fifty-thousand dollars ($150,000).

**COUNT 7 – Monell Liability Claim (Tony Mason v. City of Philadelphia)**

183. Plaintiff hereby incorporate all preceding paragraphs by reference as if set forth fully herein

184. In *Monell v. NY Dept. Social Services*, 436 U.S. 658 (1978), the Court held that municipal bodies sued under 1983 cannot be entitled to an absolute immunity.

185. The City of Philadelphia, Philadelphia Police Department via its agents, employees, servants, and others employed by the municipality and in particular Charles Ramsey, Richard Ross, Jr., Kevin Bethel, Thomas Wright, William Blackburn, and Denise Turpin, were put on notice as early as 1999, about the named Defendants and the rampant violations of citizens federal and Commonwealth constitutional rights, obstructions or justice, evidence tampering, perjury, mishandling of confidential sources/informants, hindering police investigations, and other similar acts on the part of those they were responsible for supervising years before and after the Plaintiff was arrested and prosecuted.

186. Numerous governmental commissioned reports and consent decrees regarding the Philadelphia Police Department were known to Defendant City of Philadelphia for many years prior to Plaintiff's arrest.

187. These Defendants refused to update, change, modify, or enact safer and more law-abiding Departmental policy, procedures, and/or customs, for ensuring compliance with the law. This ignorance of the plight of thousands of citizens, including the above-named Plaintiffs, were subjected to, amounts to deliberate indifference, by continuing to allow and promulgate Departmental policies, procedures, and customs to exist when these are improper and often illegal pursuant to *Monell v. NY Dept. Social Services*, 436 U.S. 658 (1978).

**WHEREFORE**, Plaintiff demands judgment against Defendants, in an official, professional, individual, and personal capacity, individually, jointly, and severally for all damages legally recoverable in addition to attorneys' fees, costs, interest, and all other relief the Court deems appropriate, and the like in excess of one hundred and fifty-thousand dollars ($150,000).

**COUNT 8 – Monell Liability Claim (Christine Handy and Stephen Lewis v. City of Philadelphia)**

188. Plaintiff hereby incorporate all preceding paragraphs by reference as if set forth fully herein

189. In *Monell v. NY Dept. Social Services*, 436 U.S. 658 (1978), the Court held that municipal bodies sued under 1983 cannot be entitled to an absolute immunity.

190. The City of Philadelphia, Philadelphia Police Department via its agents, employees, servants, and others employed by the municipality and in particular Charles Ramsey, Richard Ross, Jr., Kevin Bethel, Thomas Wright, William Blackburn, and Denise Turpin, were put on notice as early as 1999, about the named Defendants and the rampant violations of citizens federal and Commonwealth constitutional rights, obstructions or justice, evidence tampering, perjury, mishandling of confidential sources/informants, hindering police investigations, and other similar acts on the part of those they were responsible for supervising years before and after the Plaintiff was arrested and prosecuted.

191. Numerous governmental commissioned reports and consent decrees regarding the Philadelphia Police Department were known to Defendant City of Philadelphia for many years prior to Plaintiff’s arrest.

192. These Defendants refused to update, change, modify, or enact safer and more law-abiding Departmental policy, procedures, and/or customs, for ensuring compliance with the law. This ignorance of the plight of thousands of citizens, including the above-named Plaintiffs, were subjected to, amounts to deliberate indifference, by continuing to allow and promulgate Departmental policies, procedures, and customs to exist when these are improper and often illegal pursuant to *Monell v. NY Dept. Social Services*, 436 U.S. 658 (1978).

**WHEREFORE**, Plaintiff demands judgment against Defendants, in an official, professional, individual, and personal capacity, individually, jointly, and severally for all damages legally recoverable in addition to attorneys' fees, costs, interest, and all other relief the Court deems appropriate, and the like in excess of one hundred and fifty-thousand dollars ($150,000).

**COUNT 9 – Monell Liability Claim (Aurea Ocasio v. City of Philadelphia)**

193. Plaintiff hereby incorporate all preceding paragraphs by reference as if set forth fully herein

194. In *Monell v. NY Dept. Social Services*, 436 U.S. 658 (1978), the Court held that municipal bodies sued under 1983 cannot be entitled to an absolute immunity.

195. The City of Philadelphia, Philadelphia Police Department via its agents, employees, servants, and others employed by the municipality and in particular Charles Ramsey, Richard Ross, Jr., Kevin Bethel, Thomas Wright, William Blackburn, and Denise Turpin, were put on notice as early as 1999, about the named Defendants and the rampant violations of citizens federal and Commonwealth constitutional rights, obstructions or justice, evidence tampering, perjury, mishandling of confidential sources/informants, hindering police investigations, and other similar acts on the part of those they were responsible for supervising years before and after the Plaintiff was arrested and prosecuted.

196. Numerous governmental commissioned reports and consent decrees regarding the Philadelphia Police Department were known to Defendant City of Philadelphia for many years prior to Plaintiff's arrest.

197. These Defendants refused to update, change, modify, or enact safer and more law-abiding Departmental policy, procedures, and/or customs, for ensuring compliance with the law. This ignorance of the plight of thousands of citizens, including the above-named Plaintiffs, were subjected to, amounts to deliberate indifference, by continuing to allow and promulgate Departmental policies, procedures, and customs to exist when these are improper and often illegal pursuant to *Monell v. NY Dept. Social Services*, 436 U.S. 658 (1978).

**WHEREFORE**, Plaintiff demands judgment against Defendants, in an official, professional, individual, and personal capacity, individually, jointly, and severally for all damages legally recoverable in addition to attorneys' fees, costs, interest, and all other relief the Court deems appropriate, and the like in excess of one hundred and fifty-thousand dollars ($150,000).

**COUNT 10 – UNLAWFUL SEARCH AND SEIZURE (Aurea Ocasio v. Scott Schweizer and Erik Pross)**

198. Plaintiff alleges and incorporates via reference the allegations contained in all the above paragraphs, as fully as though the same were set forth herein at length.

199. Plaintiff avers the Defendants searched and seized both Plaintiff and her property without a warrant and/or a legal justification.

200. Plaintiff avers the Defendant lacked probable cause, as articulated in the United States Constitution's 4th Amendment and applied to the states via the 14th Amendment, to stop, search, and detain Plaintiffs when they first encountered her, and lacked probable cause to arrest and because the Plaintiff was seized and searched in her home which was unjust, illegal, and was the direct and causal cause of her injury.

201. Plaintiff avers her person and her property was searched and seized in an effort to prevent her from testifying in a criminal and related civil rights trial in which the Defendants were witnesses.

202. The Defendants directly, foreseeably, legally, and proximately caused Plaintiffs to have suffered unjust, unwarranted, and unlawful incarceration, prosecution, and/or will continue to suffer the following damages: Physical injuries including pain and suffering, Public shame and embarrassment, Loss of enjoyment of life, Loss of enjoyment of freedom, Loss of employment/educational opportunities and wages, and Past and future pain and suffering, extreme inconvenience, and emotional distress.

**WHEREFORE**, Plaintiff demands judgment against Defendants, in an official, professional, individual, and personal capacity, individually, jointly, and severally for compensatory, punitive, and exemplary damages in addition to attorneys' fees, costs, interest, and the like in excess of one hundred and fifty-thousand dollars ($150,000).

**COUNT 11 – ASSAULT & BATTERY (Juan Delvila v. Supervisor Carmona)**

203. Plaintiffs allege and incorporate via reference the allegations contained in all of the above paragraphs, as fully as though the same were set forth herein at length.

204. At all times relevant hereto, Defendant Supervisor Carmona owed a duty and obligation to act in accordance with standard and accepted policies and procedures to safeguard all residents civil rights, liberties, and privileges from unwarranted curtailment.

205. The Defendant deprived Plaintiff's civil rights and privileges while acting under color of law via his acts and omissions.

206. The Plaintiff was touched and caused to be touched by Defendant's actions and omissions.

207. The touching on Plaintiff's body was unwanted and harmful.

208. The touching on Plaintiff's body was unnecessary to discharge any legal obligation related to Defendant's employment duties.

209. The Defendants directly, foreseeably, legally, and proximately caused the Plaintiff to have suffered and/or will continue to suffer the following damages:

a. Past and future costs for medical treatment and care;

b. Loss of past and future earnings and earning capacity;

c. Loss of enjoyment of life;

d. Loss of enjoyment of freedom;

e. Past and future pain and suffering, inconvenience, and emotional distress

**WHEREFORE**, Plaintiff demand judgment against all Defendants in an official, professional, individual, and personal capacity, individually, jointly, and severally for compensatory, punitive, and exemplary damages in addition to attorneys' fees, costs, interest, and the like in excess of one hundred and fifty-thousand dollars ($150,000).

**COUNT 12 – ASSAULT & BATTERY (Juan Soler v. Supervisor Carmona)**

210. Plaintiffs allege and incorporate via reference the allegations contained in all of the above paragraphs, as fully as though the same were set forth herein at length.

211. At all times relevant hereto, Defendant Supervisor Carmona owed a duty and obligation to act in accordance with standard and accepted policies and procedures to safeguard all residents civil rights, liberties, and privileges from unwarranted curtailment.

212. The Defendant deprived Plaintiff's civil rights and privileges while acting under color of law via his acts and omissions.

213. The Plaintiff was touched and caused to be touched by Defendant's actions and omissions.

214. The touching on Plaintiff's body was unwanted and harmful.

215. The touching on Plaintiff's body was unnecessary to discharge any legal obligation related to Defendant's employment duties.

216. The Defendants directly, foreseeably, legally, and proximately caused the Plaintiff to have suffered and/or will continue to suffer the following damages:

f. Past and future costs for medical treatment and care;

g. Loss of past and future earnings and earning capacity;

h. Loss of enjoyment of life;

i. Loss of enjoyment of freedom;

j. Past and future pain and suffering, inconvenience, and emotional distress

**WHEREFORE**, Plaintiff demand judgment against all Defendants in an official, professional, individual, and personal capacity, individually, jointly, and severally for compensatory, punitive, and exemplary damages in addition to attorneys' fees, costs, interest, and the like in excess of one hundred and fifty-thousand dollars ($150,000).

**COUNT 13 – Intentional Infliction of Emotional Distress (Juan Delvila v. Kintock Group and Supervisor Carmona)**

217. Plaintiffs allege and incorporate via reference the allegations contained in all the above paragraphs, as fully as though the same were set forth herein at length.

218. Defendant's conduct is extreme and outrageous.

219. Defendants actions and inactions were outrageous and extreme, shocking, atrocious, and intolerable. Their conduct goes beyond the possible bounds of decency, and Defendants acted with the reckless disregard of the probability that Plaintiffs would suffer emotional distress as a result.

220. Defendant's conduct was a substantial factor in causing severe emotional and psychological distress to Plaintiffs and this distress was of such an intensity that no reasonable person should be expected to endure it.

221. Moreover, Defendants' lack of and/or failure to enforce adequate policies and procedures for the prevention of, and proper response to, abuse of its patients exacerbates and amplifies the trauma of the actual abuse due to institutional betrayal.

222. By permitting a culture of systematic physical and emotional abuse at Defendant's facilities, caused Plaintiff to suffer, among other things, appalling and deplorable acts of physical and/or emotional abuse, and the resulting pain, suffering, humiliation, grief, shame, disgust, anxiety, nervousness, shock, distrust, and loss of enjoyment of life. Plaintiffs will continue to suffer from these enduring harms, and have incurred/will continue to incur lost earnings, lost earning capacity, and expenses for psychological treatments and counseling.

**WHEREFORE,** Plaintiffs, demand judgment against Defendants, individually, jointly and/or severally, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of prejudgment interest, costs and damages for pre-judgment delay, punitive damages, and such other legal and equitable relief as the Court deems appropriate.

**COUNT 14 – Intentional Infliction of Emotional Distress (Juan Soler v. Kintock Group and Supervisor Carmona)**

223. Plaintiffs allege and incorporate via reference the allegations contained in all the above paragraphs, as fully as though the same were set forth herein at length.

224. Defendant's conduct is extreme and outrageous.

225. Defendants actions and inactions were outrageous and extreme, shocking, atrocious, and intolerable. Their conduct goes beyond the possible bounds of decency, and Defendants acted with the reckless disregard of the probability that Plaintiffs would suffer emotional distress as a result.

226. Defendant's conduct was a substantial factor in causing severe emotional and psychological distress to Plaintiffs and this distress was of such an intensity that no reasonable person should be expected to endure it.

227. Moreover, Defendants' lack of and/or failure to enforce adequate policies and procedures for the prevention of, and proper response to, abuse of its patients exacerbates and amplifies the trauma of the actual abuse due to institutional betrayal.

228. By permitting a culture of systematic physical and emotional abuse at Defendant's facilities, caused Plaintiff to suffer, among other things, appalling and deplorable acts of physical and/or emotional abuse, and the resulting pain, suffering, humiliation, grief, shame, disgust, anxiety, nervousness, shock, distrust, and loss of enjoyment of life. Plaintiffs will continue to suffer from these enduring harms, and have incurred/will continue to incur lost earnings, lost earning capacity, and expenses for psychological treatments and counseling.

**WHEREFORE,** Plaintiffs, demand judgment against Defendants, individually, jointly and/or severally, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of prejudgment interest, costs and damages for pre-judgment delay, punitive damages, and such other legal and equitable relief as the Court deems appropriate.

**Count 15 – Negligence – (Juan Delvila v. Kintock Group and Supervisor Carmona)**

229. Plaintiff hereby incorporate all preceding paragraphs by reference as if set forth fully herein.

230. By permitting a culture of systematic physical and emotional abuse at Defendant's facilities, caused Plaintiff to suffer, among other things, appalling and deplorable acts of physical and/or emotional abuse, and the resulting pain, suffering, humiliation, grief, shame, disgust, anxiety, nervousness, shock, distrust, and loss of enjoyment of life. Plaintiff will continue to suffer from these enduring harms, and have incurred/will continue to incur lost earnings, lost earning capacity, and expenses for psychological treatments and counseling.

231. The recklessness, negligence and/or carelessness of Defendants, by and through their actual or apparent staff, teachers, counselors, employees, agents, servants, representatives, and/or ostensible/aided agents hired, certified, assigned, retained, supervised, managed, overseen, directed, administrated, and/or otherwise controlled by and for said Defendants, consisted of, among other things, the following:

a. Failing to properly screen staff, teachers, counselors, employees, agents, servants, representatives, and ostensible/aided agents adequately before placing them in close contact with clients and residents;

b. Failure to properly investigate complaints of abuse, inappropriate behavior and/or other abusive behavior;

c. Minimizing, ignoring or excusing inappropriate or questionable behavior and/or misconduct by staff, teachers, counselors, employees, agents, servants, representatives, and ostensible/aided agents over a period of months, years and/or decades;

d. Failure to properly and/or adequately warn judges, probation officers, court officials, law enforcement, community members, and/or the public at large, including, but not limited to, Plaintiff and similarly situated persons, , regarding the inappropriate behavior and/or misconduct of staff, and/or other persons, and/or other abusive staff, teachers, counselors, employees, agents,

servants, representatives, and/or ostensible/aided agents, despite knowledge of the dangers they presented and the harmful and complicit culture and environment created by such failures to warn;

e. Failure to report criminal activity, to appropriate law enforcement agencies and/or authorities;

f. Negligent failure to provide a safe environment and protective culture within the campus, resident halls, bathrooms, classrooms, and/or other external locations operated, visited, and/or owned by Defendants,;

g. Failure to establish, implement, and maintain proper and effective policies and procedures to prevent abuse of and/or other abusive behavior toward clients in their care;

h. Negligently maintaining custody, supervision and protection of persons placed in their care by virtue of their legal authority;

i. Failure to properly train staff, teachers, counselors, employees, agents, servants, representatives, and/or ostensible/aided agents to identify signs of abuse by fellow employees, associates, and/or individuals within its control, oversight, supervision, and/or ostensible/aided control;

j. Negligent retention of and/or failure to terminate staff members, and/or abusive individuals from or associated with Defendant, promoting a culture and environment of complicity, denial and deception regarding abuse within its facilities;

k. Failure to exercise due care under the relevant circumstances, as it pertains to the preceding and subsequent subsections, and to be considered as a whole;

l. Recklessly, negligently and/or carelessly failing to observe, manage, direct, oversee, and supervise the relationship between Plaintiff and staff;

m. Recklessly, negligently and/or carelessly failing to have proper and effective policies and procedures to require adequate observation, management, oversight, and supervision of the relationship between staff members;

n. Recklessly, negligently and/or carelessly failing to recognize staff member's conduct and behavior prior to the events in question and/or as described herein as creating a risk of abuse toward persons, including, but not limited to, Plaintiff;

o. Recklessly, negligently and/or carelessly failing to have proper policies and procedures to require adequate observation, management, oversight, and supervision of Plaintiff and/or other staff members;

p. Failing to investigate complaints that staff including **Supervisor Carmona** was behaving inappropriately and/or touching clients inappropriately, including, but not limited to, Plaintiff;

q. Recklessly, negligently and/or carelessly failing to identify **Supervisor Carmona** and other staff members as a physical, and/or emotional abuser;

r. Recklessly, negligently and/or carelessly failing to investigate behavior of staff members including **Supervisor Carmona** that put the Defendants on notice and/or should have placed Defendants on notice that staff was and/or might have been an abuser and/or predator;

s. Recklessly, negligently and/or carelessly failing to identify staff members including **Supervisor Carmona** was a potential predator and/or abuser;

t. Failing to detect a rampant and open culture of physical, and/or emotional abuse of persons in Defendant's care;

u. Failing to stop a rampant and open culture of physical and/or emotional abuse of persons in Defendant's care;

v. Failing to prevent the abuse of clients by other clients and residents;

w. Facilitating an environment where residents were encouraged to physically and/or emotionally abuse other residents;

x. Threatening residents with physical harm in an attempt to prevent them from reporting abuse, and/or otherwise threatening punishment if the abuse was reported;

y. Preventing Defendants' residents from seeking appropriate medical attention for injuries caused by Defendant's staff;

z. Preventing Defendants' residents from honestly disclosing the causes of their injuries to medical personnel;

232. Defendant, **The Kintock Group, LLC** and **Supervisor Carmona**, were negligent under the facts as detailed within this Complaint in that this Defendant failed to use that degree of care, precaution and vigilance which a reasonably prudent person or entity would use under the same or similar circumstances, including, but not limited to, the negligent affirmative acts detailed in this Complaint which a reasonably prudent person or entity would not have done, and also the negligent omission or failure to act and/or take precautions as detailed in this Complaint which a reasonably prudent person or entity would have done or taken under these circumstances.

233. **Supervisor Carmona**'s actions as described herein are evidence of *negligence per se*.

234. Defendant, **The Kintock Group, LLC**, is vicariously liable for both the negligent and intentional acts of **Supervisor Carmona**, their employee(s), where it is widely known that there is vulnerability of persons in their care and a public policy to protect said persons from victimization, and imposes responsibility upon those individuals and institutions in the best position to know of and stop the abuse to said residents, such as the Defendants herein.

**WHEREFORE,** Plaintiff, demands judgment against Defendants, individually, jointly and/or severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00), for all damages legally recoverable and exclusive of prejudgment interest, costs and damages for pre-judgment delay, and such other legal and equitable relief as the Court deems appropriate.

**Count 16 – Negligence – (Juan Soler v. Kintock Group and Supervisor Carmona)**

235. Plaintiff hereby incorporate all preceding paragraphs by reference as if set forth fully herein.

236. By permitting a culture of systematic physical and emotional abuse at Defendant's facilities, caused Plaintiff to suffer, among other things, appalling and deplorable acts of physical and/or emotional abuse, and the resulting pain, suffering, humiliation, grief, shame, disgust, anxiety, nervousness, shock, distrust, and loss of enjoyment of life. Plaintiff will continue to suffer from these enduring harms, and have incurred/will continue to incur lost earnings, lost earning capacity, and expenses for psychological treatments and counseling.

237. The recklessness, negligence and/or carelessness of Defendants, by and through their actual or apparent staff, teachers, counselors, employees, agents, servants, representatives, and/or ostensible/aided agents hired, certified, assigned, retained, supervised, managed, overseen, directed, administrated, and/or otherwise controlled by and for said Defendants, consisted of, among other things, the following:

a. Failing to properly screen staff, teachers, counselors, employees, agents, servants, representatives, and ostensible/aided agents adequately before placing them in close contact with clients and residents;

b. Failure to properly investigate complaints of abuse, inappropriate behavior and/or other abusive behavior;

c. Minimizing, ignoring or excusing inappropriate or questionable behavior and/or misconduct by staff, teachers, counselors, employees, agents, servants, representatives, and ostensible/aided agents over a period of months, years and/or decades;

d. Failure to properly and/or adequately warn judges, probation officers, court officials, law enforcement, community members, and/or the public at large, including, but not limited to, Plaintiff and similarly situated persons, , regarding the inappropriate behavior and/or misconduct of staff, and/or other persons, and/or other abusive staff, teachers, counselors, employees, agents, servants, representatives, and/or ostensible/aided agents, despite knowledge of the dangers they

presented and the harmful and complicit culture and environment created by such failures to warn;

e. Failure to report criminal activity, to appropriate law enforcement agencies and/or authorities;

f. Negligent failure to provide a safe environment and protective culture within the campus, resident halls, bathrooms, classrooms, and/or other external locations operated, visited, and/or owned by Defendants,;

g. Failure to establish, implement, and maintain proper and effective policies and procedures to prevent abuse of and/or other abusive behavior toward clients in their care;

h. Negligently maintaining custody, supervision and protection of persons placed in their care by virtue of their legal authority;

i. Failure to properly train staff, teachers, counselors, employees, agents, servants, representatives, and/or ostensible/aided agents to identify signs of abuse by fellow employees, associates, and/or individuals within its control, oversight, supervision, and/or ostensible/aided control;

j. Negligent retention of and/or failure to terminate staff members, and/or abusive individuals from or associated with Defendant, promoting a culture and environment of complicity, denial and deception regarding abuse within its facilities;

k. Failure to exercise due care under the relevant circumstances, as it pertains to the preceding and subsequent subsections, and to be considered as a whole;

l. Recklessly, negligently and/or carelessly failing to observe, manage, direct, oversee, and supervise the relationship between Plaintiff and staff;

m. Recklessly, negligently and/or carelessly failing to have proper and effective policies and procedures to require adequate observation, management, oversight, and supervision of the relationship between staff members;

n. Recklessly, negligently and/or carelessly failing to recognize staff member's conduct and behavior prior to the events in question and/or as described herein as creating a risk of abuse toward persons, including, but not limited to, Plaintiff;

o. Recklessly, negligently and/or carelessly failing to have proper policies and procedures to require adequate observation, management, oversight, and supervision of Plaintiff and/or other staff members;

p. Failing to investigate complaints that staff including **Supervisor Carmona** was behaving inappropriately and/or touching clients inappropriately, including, but not limited to, Plaintiff;

q. Recklessly, negligently and/or carelessly failing to identify **Supervisor Carmona** and other staff members as a physical, and/or emotional abuser;

r. Recklessly, negligently and/or carelessly failing to investigate behavior of staff members including **Supervisor Carmona** that put the Defendants on notice and/or should have placed Defendants on notice that staff was and/or might have been an abuser and/or predator;

s. Recklessly, negligently and/or carelessly failing to identify staff members including **Supervisor Carmona** was a potential predator and/or abuser;

t. Failing to detect a rampant and open culture of physical, and/or emotional abuse of persons in Defendant's care;

u. Failing to stop a rampant and open culture of physical and/or emotional abuse of persons in Defendant's care;

v. Failing to prevent the abuse of clients by other clients and residents;

w. Facilitating an environment where residents were encouraged to physically and/or emotionally abuse other residents;

x. Threatening residents with physical harm in an attempt to prevent them from reporting abuse, and/or otherwise threatening punishment if the abuse was reported;

y. Preventing Defendants' residents from seeking appropriate medical attention for injuries caused by Defendant's staff;

z. Preventing Defendants' residents from honestly disclosing the causes of their injuries to medical personnel;

238. Defendant, **The Kintock Group, LLC** and **Supervisor Carmona**, were negligent under the facts as detailed within this Complaint in that this Defendant failed to use that degree of care, precaution and vigilance which a reasonably prudent person or entity would use under the same or similar circumstances, including, but not limited to, the negligent affirmative acts detailed in this Complaint which a reasonably prudent person or entity would not have done, and also the negligent omission or failure to act and/or take precautions as detailed in this Complaint which a reasonably prudent person or entity would have done or taken under these circumstances.

239. **Supervisor Carmona**'s actions as described herein are evidence of *negligence per se*.

240. Defendant, **The Kintock Group, LLC**, is vicariously liable for both the negligent and intentional acts of **Supervisor Carmona**, their employee(s), where it is widely known that there is vulnerability of persons in their care and a public policy to protect said persons from victimization, and imposes responsibility upon those individuals and institutions in the best position to know of and stop the abuse to said residents, such as the Defendants herein.

**WHEREFORE,** Plaintiff, demands judgment against Defendants, individually, jointly and/or severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00), for all damages legally recoverable and exclusive of prejudgment interest, costs and damages for pre-judgment delay, and such other legal and equitable relief as the Court deems appropriate.

**Count 17 – Negligent Supervision – (Juan Delvila v. Kintock Group)**

241. Plaintiff hereby incorporate all preceding paragraphs by reference as if set forth fully herein.

242. Defendant, knew or should have known of the need to properly and effectively observe, manage, direct, oversee, and/or supervise counselors, staff, teachers, counselors, employees, agents, servants, representatives, and/or ostensible/aided agents in their relationships with residential clients.

243. Defendant knew or should have known of the particular risk posed by **Supervisor Carmona** based on, among other things, his inappropriate and/or questionable conduct, and/or physically and/or emotionally abusing residents.

244. The negligence, carelessness, and/or recklessness of Defendant, for the conduct of their actual or apparent staff, teachers, counselors, employees, agents, servants, representatives, and/or ostensible/aided agents, in the hiring, certifying, assigning, observation, retaining, supervision, management, oversight, direction, administration, and/or otherwise control of **Supervisor Carmona** consists of one or more of the following:

a. Negligent hiring, certifying, assigning, observation, retaining, supervision, management, oversight, direction, administration, and/or otherwise control of staff and/or counselor and/or teachers in the employ of Defendant.

b. Failing to use due care in hiring, certifying, assigning, observation, retaining, supervision, management, oversight, direction, administration, and/or otherwise control of **Supervisor Carmona**'s relationship with Plaintiff; and

c. Failing to investigate and supervise **Supervisor Carmona** and his/her/their relationship with Plaintiff.

**WHEREFORE,** Plaintiff, demands judgment against Defendant, individually, jointly and/or severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00), exclusive of prejudgment interest, costs and damages for pre-judgment delay, and such other legal and equitable relief as the Court deems appropriate.

**Count 18 – Negligent Supervision – (Juan Soler v. Kintock Group)**

245. Plaintiff hereby incorporate all preceding paragraphs by reference as if set forth fully herein.

246. Defendant, knew or should have known of the need to properly and effectively observe, manage, direct, oversee, and/or supervise counselors, staff, teachers, counselors, employees, agents, servants, representatives, and/or ostensible/aided agents in their relationships with residential clients.

247. Defendant knew or should have known of the particular risk posed by **Supervisor Carmona** based on, among other things, his inappropriate and/or questionable conduct, and/or physically and/or emotionally abusing residents.

248. The negligence, carelessness, and/or recklessness of Defendant, for the conduct of their actual or apparent staff, teachers, counselors, employees, agents, servants, representatives, and/or ostensible/aided agents, in the hiring, certifying, assigning, observation, retaining, supervision, management, oversight, direction, administration, and/or otherwise control of **Supervisor Carmona** consists of one or more of the following:

   a. Negligent hiring, certifying, assigning, observation, retaining, supervision, management, oversight, direction, administration, and/or otherwise control of staff and/or counselor and/or teachers in the employ of Defendant.

   b. Failing to use due care in hiring, certifying, assigning, observation, retaining, supervision, management, oversight, direction, administration, and/or otherwise control of **Supervisor Carmona**'s relationship with Plaintiff; and

   c. Failing to investigate and supervise **Supervisor Carmona** and his/her/their relationship with Plaintiff.

**WHEREFORE,** Plaintiff, demands judgment against Defendant, individually, jointly and/or severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00), exclusive of prejudgment interest, costs and damages for pre-judgment delay, and such other legal and equitable relief as the Court deems

**Count 19 – Negligent Hiring and Retention – (Juan Delvila v. Kintock Group)**

249. Plaintiff hereby incorporate all preceding paragraphs by reference as if set forth fully herein.

250. Defendant, knew and/or should have known prior to and/or contemporaneous with the relevant time frame during which Plaintiff was physically abused by **Supervisor Carmona** that Plaintiff and other residents and clients associated with Defendant were vulnerable to and potential victims of physical and/or emotional abuse.

251. Defendant also knew and/or should have known prior to and/or contemporaneous with the relevant time frame during which Plaintiff was abused by **Supervisor Carmona** that the access to vulnerable persons, together with the trust and authority placed in staff and/or counselors and/or teachers, which makes working at a treatment and care facility for clients an enticing profession for abusers, and/or others seeking to abuse and exploit residents and vulnerable persons.

252. Defendant, owed a duty to exercise reasonable care in the hiring, certifying, assignment, control, selection and/or retention of staff, teachers, counselors, employees, agents, servants, representatives, and/or ostensible/aided agents, situated in and/or located at the Defendant, and specifically a duty to be on high look out for possible abusers, and others seeking to exploit residents and clients.

253. Defendant, failed to exercise reasonable care in the hiring, certifying, assignment, control, selection and/or retention of **Supervisor Carmona** as a staff member, teacher, employee, agent, servant, representative and/or ostensible/aided agent, among other things, the following:

a. Failing to conduct a thorough and proper background check of **Supervisor Carmona**;

b. Failing to learn of or investigate **Supervisor Carmona's** proclivity towards physical and/or emotional abuse of residents;

c. Failing to conduct a thorough and proper interview with **Supervisor Carmona**;

d. Failing to use due care in the selection of **Supervisor Carmona** as a staff and/or counselor and/or teacher rendering service(s) when having custody and/or interacting with clients;

e. Failing to use due care in the retention of **Supervisor Carmona** as a staff and/or counselor and/or teacher rendering service(s) having custody and/or interacting with clients;

f. Recklessly, negligently and/or carelessly failing to adequately check **Supervisor Carmona's** background, before hiring him/them as a staff and/or counselor and/or teacher rendering service(s) having custody and/or interacting with clients; and

g. Recklessly, negligently and/or carelessly failing to have policies and procedures in place to screen staff and/or counselor and/or teachers for the possibility of being physical and/or emotional abusers.

**WHEREFORE,** Plaintiff, demands judgment against Defendant, individually, jointly and/or severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00), exclusive of prejudgment interest, costs and damages for pre-judgment delay, and such other legal and equitable relief as the Court deems appropriate.

**Count 20 – Negligent Hiring and Retention – (Juan Soler v. Kintock Group)**

254. Plaintiff hereby incorporate all preceding paragraphs by reference as if set forth fully herein.

255. Defendant, knew and/or should have known prior to and/or contemporaneous with the relevant time frame during which Plaintiff was physically abused by **Supervisor Carmona** that Plaintiff and other residents and clients associated with Defendant were vulnerable to and potential victims of physical and/or emotional abuse.

256. Defendant also knew and/or should have known prior to and/or contemporaneous with the relevant time frame during which Plaintiff was abused by **Supervisor Carmona** that the access to vulnerable persons, together with the trust and authority placed in staff and/or counselors and/or teachers, which makes working at a treatment and care facility for clients an enticing profession for abusers, and/or others seeking to abuse and exploit residents and vulnerable persons.

257. Defendant, owed a duty to exercise reasonable care in the hiring, certifying, assignment, control, selection and/or retention of staff, teachers, counselors, employees, agents, servants, representatives, and/or ostensible/aided agents, situated in and/or located at the Defendant, and specifically a duty to be on high look out for possible abusers, and others seeking to exploit residents and clients.

258. Defendant, failed to exercise reasonable care in the hiring, certifying, assignment, control, selection and/or retention of **Supervisor Carmona** as a staff member, teacher, employee, agent, servant, representative and/or ostensible/aided agent, among other things, the following:

a. Failing to conduct a thorough and proper background check of **Supervisor Carmona**;

b. Failing to learn of or investigate **Supervisor Carmona's** proclivity towards physical and/or emotional abuse of residents;

c. Failing to conduct a thorough and proper interview with **Supervisor Carmona**;

d. Failing to use due care in the selection of **Supervisor Carmona** as a staff and/or counselor and/or teacher rendering service(s) when having custody and/or interacting with clients;

e. Failing to use due care in the retention of **Supervisor Carmona** as a staff and/or counselor and/or teacher rendering service(s) having custody and/or interacting with clients;

f. Recklessly, negligently and/or carelessly failing to adequately check **Supervisor Carmona's** background, before hiring him/them as a staff and/or counselor and/or teacher rendering service(s) having custody and/or interacting with clients; and

g. Recklessly, negligently and/or carelessly failing to have policies and procedures in place to screen staff and/or counselor and/or teachers for the possibility of being physical and/or emotional abusers.

**WHEREFORE,** Plaintiff, demands judgment against Defendant, individually, jointly and/or severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00), exclusive of prejudgment interest, costs

and damages for pre-judgment delay, and such other legal and equitable relief as the Court deems appropriate.

**Count 21 – Gross Negligence – (Juan Delvila v. Kintock Group and Supervisor Carmona)**

259. Plaintiff hereby incorporate all preceding paragraphs by reference as if set forth fully herein.

260. Defendants, were grossly negligent under the facts as detailed within this Complaint in that these Defendants acted with complete disregard of the rights, safety, and well-being of others; in a palpably unreasonable manner; in an outlandish fashion; and/or failed to exercise slight care or diligence under these circumstances.

**WHEREFORE,** Plaintiff, demands judgment against Defendants, individually, jointly and/or severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00), exclusive of prejudgment interest, costs and damages for pre-judgment delay, and such other legal and equitable relief as the Court deems appropriate.

**Count 22 – Gross Negligence – (Juan Soler v. Kintock Group and Supervisor Carmona)**

261. Plaintiff hereby incorporate all preceding paragraphs by reference as if set forth fully herein.

262. Defendants, were grossly negligent under the facts as detailed within this Complaint in that these Defendants acted with complete disregard of the rights, safety, and well-being of others; in a palpably unreasonable manner; in an outlandish fashion; and/or failed to exercise slight care or diligence under these circumstances.

**WHEREFORE,** Plaintiff, demands judgment against Defendants, individually, jointly and/or severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00), exclusive of prejudgment interest, costs and damages for pre-judgment delay, and such other legal and equitable relief as the Court deems appropriate.

**Count 23 – Negligent Infliction of Emotional Distress – (Juan Delvila v. Kintock Group and Supervisor Carmona)**

263. Plaintiff hereby incorporates all preceding paragraphs by reference as if set forth fully herein.

264. At all times relevant and material hereto, the Defendants had a duty to exercise reasonable care to protect Plaintiff from harm while in its care.

265. Under Pennsylvania statutes and regulation, the Defendants owed Plaintiff an affirmative duty of care to ensure their safety and well-being and provide them with adequate protection and medical care while in their care.

266. Defendants had a contractual and fiduciary duty of care to Plaintiff while in their custody and control.

267. Defendants, breached their duties by failing to provide Plaintiff a safe environment and exposing him to abusive and violent conduct from which he suffered physical and emotional injury.

268. As a result of the Defendants failure, Plaintiff's emotional harm was so extreme that a reasonable person should not and cannot be expected to endure the resulting stress. The severe emotional harm that Plaintiff suffered includes, but is not limited to: horror, pain, anxiety, worry, shock, severe post-traumatic stress, humiliations, embarrassment, shame, feelings of powerlessness, anger aggression, fear and distrust of authority, severe stress, difficulty sleeping, nightmares, night sweats, depression, emotional withdrawal, and difficulty coping with daily life. Plaintiff continues to struggle, cope, and attempt to heal from his emotional distress.

269. Defendants, negligence was the proximate cause of Plaintiff's severe emotional distress and harm.

**WHEREFORE,** Plaintiff, demands judgment against Defendants, individually, jointly and/or severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00), exclusive of prejudgment interest, costs and damages for pre-judgment delay, and such other legal and equitable relief as the Court deems appropriate.

**Count 24 – Negligent Infliction of Emotional Distress – (Juan Soler v. Kintock Group and Supervisor Carmona)**

270. Plaintiff hereby incorporates all preceding paragraphs by reference as if set forth fully herein.

271. At all times relevant and material hereto, the Defendants had a duty to exercise reasonable care to protect Plaintiff from harm while in its care.

272. Under Pennsylvania statutes and regulation, the Defendants owed Plaintiff an affirmative duty of care to ensure their safety and well-being and provide them with adequate protection and medical care while in their care.

273. Defendants had a contractual and fiduciary duty of care to Plaintiff while in their custody and control.

274. Defendants, breached their duties by failing to provide Plaintiff a safe environment and exposing him to abusive and violent conduct from which he suffered physical and emotional injury.

275. As a result of the Defendants failure, Plaintiff's emotional harm was so extreme that a reasonable person should not and cannot be expected to endure the resulting stress. The severe emotional harm that Plaintiff suffered includes, but is not limited to: horror, pain, anxiety, worry, shock, severe post-traumatic stress, humiliations, embarrassment, shame, feelings of powerlessness, anger aggression, fear and distrust of authority, severe stress, difficulty sleeping, nightmares, night sweats, depression, emotional withdrawal, and difficulty coping with daily life. Plaintiff continues to struggle, cope, and attempt to heal from his emotional distress.

276. Defendants, negligence was the proximate cause of Plaintiff's severe emotional distress and harm.

**WHEREFORE,** Plaintiff, demands judgment against Defendants, individually, jointly and/or severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00), exclusive of prejudgment interest, costs and damages for pre-judgment delay, and such other legal and equitable relief as the Court deems appropriate.

## PUNITIVE DAMAGES REQUEST

277. Plaintiff alleges and incorporates via reference the allegations contained in all the above paragraphs, as fully as though the same were set forth herein at length.

278. Defendants actions in depriving Plaintiff of his rights, freedoms, privileges, and liberties is so outrageous as to shock the conscience of reasonable persons and shows reckless indifference for the Plaintiff's rights, especially when there was no reasonable suspicion or probable cause to believe he was committing a criminal act when police arrested him.

**WHEREFORE**, Plaintiffs demand exemplary and punitive damages plus attorneys' fees and costs in an amount in excess of One-Hundred and Fifty-Thousand Dollars ($150,000) against all Defendants officially, personally, professionally, individually, jointly, and severally.

## JURY DEMAND

279. Plaintiff alleges and incorporates via reference the allegations contained in all the above paragraphs, as fully as though the same were set forth herein at length.

280. Plaintiffs demand a jury to determine the extent of damages and provide a full and fair determination pursuant to the United States Constitutional Amendments V, VI, and XIV.

Respectfully Submitted,



/S/ David Wesley Cornish, Esquire
David Wesley Cornish, Esquire
Bar ID #: 310865
Cornerstone Legal Group, LLC
230 South Broad Street, 17th Floor
Philadelphia, PA 19102
Phone: 212-444-2039
**ATTORNEY FOR PLAINTIFFS**
***DATE***: January 4, 2024

| | | |
|---|---|---|
| **Juan Delvila, Juan Soler, Tony Mason,** | **:** | **United States District Court** |
| **Christine Handy, Stephen Lewis,** | **:** | **Eastern District of Pennsylvania** |
| **Aurea Ocasio, Plaintiffs,** | **:** | |
| **vs.** | **:** | |
| **Thomas Liciardello, Brian Reynolds,** | **:** | **Civil Division – Civil Rights** |
| **Jeffrey Walker, Perry Betts, Michael Spicer,** | **:** | |
| **Jonathan Speiser, Linwood Norman, Roberito** | **:** | |
| **Fontan, Erik Pross, The Kintock Group, LLC,** | **:** | |
| **Supervisor Carmona, Scott Schweizer** | **:** | |
| **Defendants** | **:** | **Case No.: 15-cv-2521** |

## VERIFICATION

The facts set forth in the foregoing Amended Complaint are true and correct to the best of the undersigned's knowledge, information and belief and are verified subject to the penalties for perjury and unsworn falsification to authorities and/or the tribunal.

Respectfully Submitted,

/S/ David Wesley Cornish, Esquire

David Wesley Cornish, Esquire
Bar ID #: 310865
Cornerstone Legal Group, LLC
230 South Broad Street, 17th Floor
Philadelphia, PA 19102
Phone: 212-444-2039
**ATTORNEY FOR PLAINTIFFS**

***DATE***: January 4, 2024